**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| HEARN INSULATION & | * | |
| IMPROVEMENT COMPANY, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. AW-09-990 |
| | * | |
| CARLOS BONILLA, *et al.*, | * | |
| | * | |
| Defendants. | * | |

## **MEMORANDUM OPINION**

Plaintiff Hearn Insulation & Improvement Company, Inc. ("Hearn") brings this action against Defendants Carlos Bonilla ("Bonilla") and Premium Construction Services ("PCS") alleging breach of contract and tortious interference with business relations. Currently pending before the Court are Defendants' Renewed Motion for Summary Judgment (Doc. No. 47) and Plaintiff's Cross-Motion for Summary Judgment as to Counts I, II, and III of the Complaint (Doc. No. 57). The Court has reviewed the entire record, as well as the pleadings and exhibits, with respect to the instant motions. The issues have been fully briefed, and no hearing is deemed necessary. See Local Rule 105.6 (D. Md. 2008). For the reasons stated more fully below, the Court will grant in part and deny in part both parties' motions.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Hearn is a home improvement company, contractor and subcontractor, that has operated in the Washington, D.C. metropolitan area for approximately seventy years. PCS is a roofing company and subcontractor of which Bonilla is president. Hearn retained Bonilla and PCS as roofing

1

subcontractors. On December 30, 2005, Bonilla signed an Independent Contractor Agreement (the "Agreement") with Hearn. The relevant portions of the Agreement are the sections on non-solicitation, confidentiality and nondisclosure, and the use of trade secrets and confidential information. In relevant part, the non-solicitation provision states:

> 6.1 **Non-Solicitation of Clients**. . . . Contractor agrees that during the term of Contractor's engagement and for a period of two (2) years after Contractor's termination, Contractor shall not directly or indirectly contact, solicit or attempt to solicit, or be otherwise engaged or employed by, on Contractor's own behalf or on behalf of any other person or entity other than Company, any current customer or client for whom Company is providing services to, or prospective customer or client of Company with whom Contractor had contact with in the two (2) years prior to Contractor's termination, with a view to offering or providing any services that is competitive with the Company's business, or encouraging any customer or client to discontinue business with the Company. . .

The provision regarding the use of trade secrets and confidential information provides:

> 5.2 **Use of Trade Secrets and Confidential Information**. Contractor agrees to use the Trade Secrets and Confidential Information exclusively for the benefit of the Company. Except in the course of performing services for the Company, during the term and following the termination of this Agreement, Contractor will hold in strict confidence and will not disclose, use, reproduce, distribute, transmit, reverse engineer, decompile, disassemble, or transfer, directly or indirectly, in any form, by any means, or for any purpose, any Trade Secrets and Confidential Information or any portion thereof made available to Contractor during the course of the Contractor's engagement with the Company, without the prior written consent of the Company.

After signing the contract, PCS performed mainly roofing work for Hearn, and also completed occasional work on siding and gutters.

Palmer Brothers Painting and Contractors, Inc. ("Palmer") hired Hearn as a contractor in the summer of 2006, and Hearn used Bonilla as a subcontractor on Palmer's projects. In spring or summer of 2008 Palmer became dissatisfied with Hearn's work. Defendants claim that Palmer

decided to stop working with Hearn in May 2008, while Plaintiff claims that the evidence does not show Palmer made such a decision since the corporate designee of Palmer stated in deposition that he could not recall when he stopped contracting with Hearn, and a Palmer employee did mistakenly contact Hearn to solicit bids after that point, which Hearn submitted in May of 2009.

In May 2008 Palmer solicited PCS to work for it. Bonilla's invoices to Palmer reflect work performed in May, June, July, August, September, October, November and December of 2008. There is also an invoice from January 2008, which Defendants explain was a typographical error that should state 2009. In January 2009 Hearn terminated its relationship with Bonilla based on its belief that Bonilla was soliciting Palmer as its customer.

On March 4, 2009, Plaintiff sued Defendants for breach of contract and tortious interference with contract in the Circuit Court for Montgomery County, Maryland, and on April 17, 2009, Defendants removed the case to this Court. Defendants then counterclaimed alleging breach of contract and seeking a declaration that the non-solicitation and confidential information provisions of the Agreement are void under Maryland law. The Court denied Defendants' previous motion to dismiss the Complaint or for summary judgment, partially on the ground that the question of whether the non-solicitation and confidential information clauses are void under Maryland law involves issues of fact such as the scope of Hearn's business and the likely effects that this covenant would have on Defendants. The parties have completed discovery. Now pending before the Court is Defendants' Renewed Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment on the first through third counts of the complaint.[1]

## II. STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). When parties file cross motions for summary judgment, the Court must view each motion in a light most favorable to the non-movant. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.,* 152 F.3d 326, 330-31 (4th Cir. 1998). Additionally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

## III. ANALYSIS

Defendants move for summary judgment on Plaintiff's entire Complaint and on their

---

[1] Plaintiff does not move for summary judgment on its accounting claim (Count IV).

counterclaim regarding the validity of the non-solicitation and trade secrets provisions of the Agreement on the grounds that (i) the contract cannot be enforced because it is overly broad, violates public policy, and lacks consideration and (ii) they did not breach the contract. Plaintiff cross-moves for partial summary judgment on Counts I through III of its Complaint, arguing that (i) permanent injunctive relief is necessary, (ii) there is no genuine dispute of material fact that Bonilla breached the contract by engaging in contracting work for Palmer and (iii) for similar reasons, there is no dispute of material fact regarding the tortious interference with contract claim. The Court finds (i) that the contract is enforceable, (ii) that Bonilla breached the non-solicitation provision of the Agreement by working for Palmer less than two years after his termination, but that the record does not support a finding of damages, nor does it support a finding of breach of the confidentiality and trade secrets provisions of the Agreement, and (iii) that the record does not support a claim for tortious interference with contract. Additionally, the Court finds that as a result of those holdings, permanent injunctive relief is appropriate, but an accounting is not warranted.

### i. **Enforceability of Contract**

Defendants contend that the non-solicitation clause is unenforceable because (1) its definition of prospective customer is too vague, (2) enforcement of the contract is against public policy because Hearn had no protectable interest that would justify a non-compete clause, (3) Bonilla failed to read the contract before signing it, and (4) continued employment is not adequate consideration. Plaintiff responds that (1) the contract is sufficiently specific, (2) Hearn has a protectable interest in preventing competition from subcontractors, (3) whether Bonilla read the contract is irrelevant, and (4) continued employment is clearly sufficient consideration.

5

The Court agrees with Plaintiff on all of these arguments and thus finds the contract fully enforceable. To the extent that Defendants also challenge the validity of the confidentiality provisions (5.1-5.2), the Defendants have not presented any specific arguments as to how these provisions are unenforceable, and thus the Court rejects any facial challenge to their enforcement.[2]

### 1. Vagueness

Defendants contend that the non-solicitation provision is so vague that it cannot be enforced. Specifically, they argue that the Agreement's prohibition of Bonilla contacting any "prospective customer or client of Company with whom Contractor had contact with in [sic] the two (2) years prior to Contractor's termination" could include practically any party, and that more restrictions are necessary for the contract to be enforceable. (Compl. ¶ 9.) Plaintiff responds that that the Agreement's limitation of the term "prospective" to customers "with whom Contractor had contact with in the two (2) years prior to Contractor's termination" is sufficiently specific. (Doc. No. 57 at 9.) The Court agrees with Plaintiff that the restriction on prospective clients is specific enough to make the contract enforceable, as the latter clause poses a significant limitation on the parties whom the contractor is banned from soliciting.

"Under Maryland law, a restrictive covenant will be upheld 'if the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public.'" *Deutsche Post Global Mail, Ltd. v. Conrad*, 292 F. Supp.

---

[2] Defendants do not specifically request this finding in their Motion for Summary Judgment, but do in the Order thereto attached.

2d 748, 753 (D. Md. 2003) (quoting *Silver v. Goldberger*, 231 Md. 1, 7, 188 A.2d 155, 158 (1963)). The Court believes that because the Agreement prohibits Bonilla from contacting only those clients with which he had contact while working for Hearn, and for only two years after termination of his employment with Hearn, the Agreement is reasonable in scope and duration. Maryland courts have long enforced covenants such as this which provide reasonably limited bans on solicitation of clients of a former employer. *See Gill v. Computer Equipment Corp.*, 292 A.2d 54, 58 (Md. 1972) (upholding covenant that only barred employee from servicing customers of the division in which he had worked). Defendants cite *Deutsche Post Global Mail, Ltd. v. Conrad*, 292 F. Supp. 2d 748, 755-758 (D. Md. 2003), for the proposition that this restriction is too broad, but the covenant the *Deutsche Post* court found unenforceable did not limit client solicitation to only those clients with whom the employees had interacted. Rather, the plaintiff in that case suggested the court add in such a limitation to make the non-solicitation clause valid, but the court found that it could not add language to the contract. *See id.* at 757. Another crucial distinction between the instant case and *Deutsche Post* is that the employer company in *Deutsche Post* had a market share of the business, and thus a ban on employee solicitation of the company's clients would have eliminated a large percentage of the former employee's potential clients, and thus would have stifled broader market competition. In this case, there is no indication that Plaintiff worked with any sizable portion of the contracting market, and accordingly there is no suggestion that enforcement of this covenant would erode the competitive marketplace. In fact, it would appear that Hearn is a relatively small business as roughly about twenty-five percent of its business came from Palmer from 2006-2008. (Doc No. 57, Ex. D at 56:7-57:15.) Accordingly, the Court finds the covenant is reasonably limited and not

so vague as to be unenforceable.

## 2. Public Policy

Next, Defendants contend that the non-solicitation clause is effectively a covenant not to compete which is unenforceable against a general contractor like Bonilla who did not perform unique services, was not involved in the solicitation of jobs, did not operate on a regular route, and did not serve the same customers constantly. (Doc. No. 47 at 15.) Plaintiff does not argue that contracting is a unique service, but rather, argues that this restrictive covenant is enforceable to protect Hearn's legitimate interest in preventing subcontractors such as Bonilla, who dealt with customers regularly and created good will, from "using the contacts established during employment to pirate the employer's customers." (Doc. No. 57 at 7.) The Court agrees with Plaintiff that enforcement of this restrictive covenant is consistent with public policy because Bonilla was in a position to create good will with clients.

Covenants not to compete are enforceable, "if a part of the compensated services of the former employee consisted in the creation of the good will of customers and clients which is likely to follow the person of the former employee." *Silver*, 188 A.2d at 158. "Covenants of employment contracts of 'employees, who, in . . . serving the same customers constantly, come into personal contact with the customers of the employer, usually [are enforceable].' Otherwise, employees are free to use the knowledge they have gleaned from their past employers to become more efficient competitors in the marketplace, as long as they do not exploit personal contacts with customers or clients of the former employer." *Source Servs. Corp. v. Bogdan*, No. 94-1790, 1995 U.S. App. LEXIS 3352 at *10 (4th Cir. Feb. 21, 1995) (quoting *Silver*, 188 A.2d at 158).

The Court believes that Plaintiff has shown Bonilla had sufficient contact with clients, so

8

as to give Plaintiff a protectable interest in preventing post-employment competition from Bonilla. Though Plaintiff does not provide extensive evidence of the type of relationship Bonilla had, it is undisputed that Palmer's corporate designee met Bonilla when he was performing a subcontracting job through Hearn for Palmer. (Doc. No. 57, Ex. G at 16:20-17:7.) The Court believes this evidence is sufficient to make this case the type of "personal contact" case the *Silver* court distinguished from the scenario it addressed where the employer did not "show that his former employees had or were likely to take some of his clients away from him." *Silver*, 188 A.2d at 159. Defendants rely heavily on the fact that Bonilla did not perform sales or business development for Hearn and that Hearn hired separate sales personnel for this function. But, the Court believes that the protectable interest is not limited to where a party performs a sales function, but rather, depends on the broader question of whether the party had contact with the customer so as to develop good will, even in a non-sales capacity. Accordingly, the Court believes that the non-solicitation provision's purpose is valid and consistent with public policy.

### 3. Failure to read contract

Defendant Bonilla also argues that enforcement of the covenant would disserve the interests of public policy because he failed to read the contract before signing it. This argument is counter to well-established legal authority holding that a person is bound to a contract by his signature, regardless of whether he read the agreement. In the absence of fraud, duress, mutual mistake, or indication that the other party should have known "that the apparent acceptor does not intend what his words or other acts ostensibly indicate," *Binder v. Benson*, 171 A.2d 248, 250 (Md. 1961), "one having the capacity to understand a written document who . . . without reading it or having it read to him, signs it, is bound by his signature." *Canaras v. Lift Truck*

*Services, Inc.*, 322 A.2d 866, 870 (1974) (citation omitted). Defendants' bald assertion that *Canaras* is inapposite because in that case the employer, rather than the employee as in the instant case, failed to read the contract, is unavailing because the law is clear that absent fraud or some other sort of procedural problem a signature binds a party to a contract. Accordingly, Bonilla's failure to read the contract is irrelevant to the question of whether the contract is enforceable in this case.

### 4. Consideration

Defendants contend that Bonilla's continued employment by Hearn was not sufficient consideration to validate this contract as continued employment was not a sufficient additional advantage in this case. The Court believes continued employment for at least three years after signing the Agreement was sufficient consideration to make the Agreement enforceable here. It is well established that an agreement is binding and enforceable only if it is a valid contract supported by consideration. *Cheek v. United Healthcare of the Mid- Atl., Inc.*, 835 A.2d 656, 661 (2003) ("To be binding and enforceable, contracts ordinarily require consideration."). "A promise becomes consideration for another promise only when it constitutes a binding obligation." *Id.* The law clearly provides that continued employment of an at-will employee for a significant period constitutes sufficient consideration for a restrictive covenant where there is no allegation of bad faith or other compromising circumstance. *See Simko, Inc. v. Graymar Co.*, 464 A.2d 1104, 1107-08 (Md. Ct. Spec. App. 1983)("the continuation of employment for a substantial period beyond the threat of discharge is sufficient consideration for a restrictive covenant"). The Court is unpersuaded by Defendants' attempts to distinguish the instant case from *Simko* as the Court does not see any circumstances in this case that would render continued

employment insufficient compensation.

In sum, the Agreement is enforceable and thus Plaintiff may bring a claim for breach of contract. Additionally, Defendants' counter-claim for a declaratory judgment that the Agreement is unenforceable must be dismissed.

      **ii.**      **Breach of Contract**

To make a claim for breach of contract, a plaintiff must demonstrate "that the defendant had a contractual obligation and that the obligation was breached." *Mathis v. Hargrove*, 888 A.2d 377, 396 (Md. Ct. Spec. App. 2005). Defendants argue that neither their work for Royal Gutters nor their work for Palmer breached the Agreement since (1) Hearn's last contract with Royal Gutters was in 2002, and thus Defendants' contact with Royal Gutters did not violate the two-year ban on contact post-termination and (2) PCS's work for Palmer was consistent with the Agreement because Palmer was not an actual or prospective customer at the time. Plaintiff cross-moves for summary judgment on the breach of contract claim, contending that it has demonstrated the existence of valid non-solicitation and non-disclosure provisions of the contract and a material breach thereof in Bonilla's solicitation and engagement of Palmer starting in May 2008. The Court agrees with Defendants that their work for Royal Gutters did not violate the Agreement as Hearn last contracted with Royal Gutters in 2002 and there is no indication Royal Gutters was a current or perspective customer of Hearn after that point. The Court believes that it is quite clear that Bonilla breached the terms of the non-solicitation provision of the Agreement by placing a bid with Palmer in May 2008. The Court also finds that the record overwhelmingly supports the conclusion that Defendant Bonilla did not breach the confidentiality and trade secrets provisions, and thus grants summary judgment to Defendants on

11

that claim.

The Agreement clearly restricts Bonilla from working for any "client of [Hearn] with whom [Bonilla] had contact with in the two (2) years prior to [Bonilla's] termination," for two years after his termination. (Compl. ¶ 9.) The parties disagree on the timing and significance of several events, namely: (1) when Bonilla first made contact with Palmer; (2) whether and when Palmer definitively rejected working with Hearn; and (3) the significance of Palmer's request for a bid from Hearn in 2009.[3]

Regarding the first issue, the Court finds that the evidence indicates that the January 2008 date on the PCS invoice on a Palmer project was a typographical error. (Doc. No. 57, Ex. H.) Bonilla has said in deposition that he did not start work for Palmer until May 2008, and a January 2009 invoice would be consecutive with the other invoices from May through December of 2008. (Doc. No. 47, Ex. 2, 38; Doc. No. 57, Ex. H.) Thus the Court finds that the May 2008 work was PCS's first engagement with Palmer.

The Court finds that Defendant violated the Agreement in May 2008 by performing the Tanglewood roof project. It is undisputed that Hearn submitted a bid to Palmer for the Tanglewood roof project, and that PCS then submitted a bid for Palmer's Tanglewood roof project and performed the project, and though there is a dispute as to the dates, it ranged somewhere between March and May 2008. (Doc. No. 57, Ex. G at 44:2-19.) Thus, while there is no conclusive proof of a timing overlap, it is undisputed that PCS performed a project for which Hearn had bid, which the Court believes clearly indicates Bonilla violated the non-solicitation

---

[3] The Court notes that there is arguably some ambiguity as to whether the contract bans interaction with any past clients with whom the Contractor interacted in the prior two years, or whether they must still be current or prospective clients. Because the Plaintiff has shown Palmer remained a prospective client, the Court will not address

provision.

Defendants ask the Court to find that Palmer's apparently poorly communicated internal decision to no longer work with Hearn expunged its status as a potential customer. The Court believes that the facts of the case clearly undermine the possibility of such an interpretation. While Defendants contend that Palmer had renounced working with Hearn, the evidence indicates that this decision was not effectively communicated to the relevant parties, including Hearn and Palmer's employees. The corporate designee of Palmer stated in deposition that at some point he informed Hearn, via its president, Shirley Goldsborough, that Palmer no longer intended to use Hearn as a subcontractor. (Doc. No. 57, Ex. G at 44:2-19.) Shirley Goldsborough, denies ever having had such a conversation, however, explaining "nobody said that I was not going to get any other work." (Doc. No. 47, Ex. 1 at 35:10.)

Additionally, the Court cannot ignore the import of the fact that an employee of Palmer specifically requested a bid from Hearn after this telephone conversation, and Hearn submitted the bid in May 2009. (Doc. No. 57, Ex. G at 45:2-19.) Regardless of whether Palmer's 2009 request for a bid from Hearn was made in error, as Defendants contend, it made Palmer a potential customer of Hearn, as Palmer requested the bid, and Hearn submitted it. Thus, Bonilla violated the Agreement by contracting with Palmer through 2009.

Regarding the violation of the trade secrets and confidentiality provisions, the Court believes Defendants have presented overwhelming evidence that Bonilla did not know the pricing structure or other confidential information. First, Bonilla in deposition flatly denies knowledge of this information, explaining "I never knew the price [Hearn] charged," and was

---

this issue.

not responsible for communicating Hearn's pricing information to clients. (Doc. No. 47, Ex. 2 at 13:15.) Moreover, though in her affidavit Shirley Goldsborough broadly asserts that Bonilla learned pricing information and information about the bidding process as Hearn's contractor (Doc. No. 57, Ex. A ¶ 10) in her deposition, she clarifies that in fact she only thinks that he knew this information, explaining. She states, "I think he's talked with the salesmen." (Doc. No. 47, Ex. 1 at 52-53) and goes on to explain that the price terms were redacted in the contracts she provided him. (*Id.*) She also explains that she could not say if "he was issued any written materials that were confidential . . . any manuals, price lists, [or] anything else [] confidential." (Doc. No. 47, Ex. 1 at 84.) The Court believes that Plaintiff has failed to show any evidence of a breach of the trade secrets and confidentiality provisions of the Agreement and thus grants summary judgment to Defendants on the breach of contract claim for those provisions.

### iii. Damages

Finally, Plaintiff contends that there is no dispute of material fact that Defendants' breach proximately caused it damages. Defendants respond that Plaintiff has not shown entitlement to these damages and also contends that Plaintiff is in essence requesting a liquidated damages penalty, which is unenforceable under *Willard Packaging Company, Inc. v. Javier*, 899 A.2d 940 (Md. Ct. Spec. App. 2006). The Court believes that the record overwhelmingly supports a finding that Palmer would not have hired Hearn even absent Bonilla's bid, and that Hearn is thus not entitled to the damages. Accordingly, the Court will deny Plaintiff's claim for damages of lost profits.

The Court believes that Plaintiff's claim for damages is very similar to the claim this Court adjudicated in *Planmatics v. Showers*, 137 F. Supp. 2d 616, 622 (D. Md. 2001). In that

case, the Court acknowledged that "in the context of a contract not to compete, it has been found that the fact of a breach accompanied by the directing of profits to the breaching party can provide the requisite causal nexus even when the injured party has no prior business relationship with the customers in dispute." But, the Court granted summary judgment to defendant former employee on the damages claim because "the disputed customer voiced a strong objection to any future business dealings with the Plaintiff independent of any alleged breach by" the defendant, and the plaintiff "failed to adduce evidence [from] which a reasonable jury could find that [Defendant's] alleged breach of the non-competition agreement caused [Plaintiff] to lose [the disputed customer's]business." *Planmatics*, 137 F. Supp. at 632. Similarly, here, Defendants have produced substantial evidence indicating that Palmer would not have hired Plaintiff, including the affidavit of William J. "Billy" Jackson, Palmer's Senior Project Manager that it had decided not to work with Hearn as of summer 2008, and that it had been dissatisfied with Hearn's work due to three mistakes.[4] (Doc. No. 57, Ex. E ¶¶ 4-5.) Moreover, it appears that Palmer initially relied on Plaintiff's bid in this project, but that Plaintiff informed Palmer that it was an inaccurate bid, after Palmer had already relied on the bid. (Doc. No. 57, Ex. G at 32.) Plaintiff contends that it has satisfied the necessary showing of causal nexus by producing sufficient evidence to indicate that had Defendants not breached the Agreement, Palmer might have hired it, which it claims to have satisfied by showing Palmer requested a bid from it. But, Defendants' strong evidence that Palmer had decided to never again hire Hearn completely

---

[4] Those mistakes are: (1) In March 2008 Hearn started construction on a project without permission; (2) On or about February 11, 2008, Hearn submitted an erroneous bid; and (3) In preparing a proposal to repair and replace existing tiles on the Palmer Chief Executive Officer's home, Hearn employees cracked tiles on the roof.

15

undermines this assertion.[5] Thus, the Court must reject Plaintiff's contention that it is entitled to lost profits, which it calculates at fifty percent, its usual margin of profit, of the amount Bonilla charged for the work, which comes to $82,654.35. Based on the record, the Court must instead grant summary judgment to Defendants on the issue of damages.

The *Planmatics* court explained that even where a damages claim has been denied as a matter of law, "Maryland still affords the aggrieved party to a breach of contract action the remedy of nominal damages or other appropriate relief." Accordingly, the Court's decision denying Plaintiff's damages claim does not undo Plaintiff's successful breach of contract claim. Rather, the Court may assess nominal damages or other relief on this claim.

    **iv.    Permanent injunction (Count I)**

Plaintiff also moves for summary judgment on its claim that it is due permanent injunctive relief as it has satisfied the necessary test for securing permanent injunctive relief from a breach of a non-solicitation and trade secrets and confidentiality provisions of the Agreement—the existence of a valid covenant and the breach thereof. Defendants do not specifically address Plaintiff's request for permanent injunction. The Court believes Plaintiff has presented a cogent basis for a permanent injunction as to the non-solicitation provision, though the Court will not grant an injunction as broad as that requested. As the Court has granted summary judgment to Defendants on breach of the trade secrets and confidentiality provisions, a permanent injunction pertaining to those provisions is unwarranted.

Regarding the non-solicitation provision, Plaintiff requests a permanent injunction:

---

[5] The Court believes this conclusion is consistent with its view that the same evidence did not indicate Palmer was no longer Hearn's prospective customer as that assessment relied on other factors as well.

"enjoining Bonilla from contacting, soliciting, accepting employment, or engagement with any Hearn customers (past, present, and/or active prospective) for a period of two years." (Compl. ¶ 25.) "A permanent injunction is, as its name indicates, an injunction final or permanent in its nature granted after a determination of the merits of the action." *Colandrea v. Wilde Lake Community Assoc., Inc.*, 761 A.2d 899, 911 (Md. 2000) (internal quotation marks and citation omitted). "The requirements for the issuance of a permanent injunction to enforce contract, i.e., rights under covenants, are based primarily on contract law . . . One of the elements that may be considered is the doctrine of comparative hardship. An innocent mistake on the part of the party in breach of the covenant can be considered in that analysis." *Id.* at 912 n.7. Plaintiff has shown breach of contract here, and there is no indication that Defendant's hardship in abiding by the contract would pose a comparatively undue burden. Accordingly the Court will grant this request. But, the Court finds the injunction's notable exclusion of the solicitation ban's limitation to only those customers with whom Bonilla interacted is flawed, and will thus add that limitation. As it is undisputed that Bonilla worked for Hearn until January 2009, the two-year ban on competition will not expire until January 2011.

     v.   **Tortious Interference with Business Relations (Count III)**

Plaintiff moves for summary judgment on its claim that Defendants tortiously interfered with business relations (Count III). Defendants do not discuss this claim at all in their Motion for Summary Judgment, but as they move for summary judgment on all counts the Court will consider the evidence they have presented that relates to this claim. The elements required to establish the tort of wrongful interference with contractual or business relations are:

"(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their

17

>lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting."

*Kaser v. Fin. Prot. Mktg.*, 376 Md. 621, 629 (2003) (quoting *Willner v. Silverman*, 109 Md. 341, 71 A. 962, 964 (1909) (internal quotation marks and citation omitted)). Plaintiff contends that (1) Bonilla's working for Palmer, which he knew was Hearn's customer constituted an intentional and willful act, (2) that placing bids for work with Palmer at prices below Hearn's was calculated to cause damage to Hearn, and (3) done with unlawful purpose since Bonilla knew he would directly compete with Hearn, (4) and actual damage resulted.

The Court believes that the overwhelming evidence on the record shows that Defendants did not tortiously interfere with Plaintiff's business relations as the evidence does not indicate that Defendants acted with a wrongful purpose. "Whether that effect is tortious interference with the [plaintiff-third party] relationship depends in large measure on whether [the defendant's] purpose or motive in breaching the [defendant-third party] contract is to interfere with the [plaintiff-third party] relationship." *K & K Management, Inc. v. Lee*, 557 A.2d 965, 975 (Md. 1989). Here, Plaintiff has presented no evidence that Bonilla had a wrongful or unlawful purpose in pursuing work with Palmer, while Defendants have presented ample evidence that Bonilla did not harbor any wrongful or unlawful motive, but rather actually believed that his actions were allowed based on Palmer's termination of its relationship with Hearn. Moreover, breach of a contract cannot provide the basis for the wrongfulness element of the claim, as Maryland courts have "refused to adopt any theory of tortious interference with contract or with economic relations that converts a breach of contract into an intentional tort." *Alexander v. Evander*, 650 A.2d at 269-270 (internal quotation marks omitted). Accordingly the Court grants summary

judgment to Defendants on the tortious interference with business relations claim.

### vi. Accounting (Count IV)

Finally, though Defendants make no explicit argument regarding Plaintiff's claim for an accounting, to the extent it is based on the damages in the breach of contract claim or tortious interference claim which the Court has denied, the Court must grant summary judgment to Defendants on the accounting request.

## IV. CONCLUSION

For the foregoing reasons, the Court will GRANT IN PART and DENY IN PART Defendants' Renewed Motion for Summary Judgment and GRANT IN PART and DENY IN PART Plaintiff's Cross-Motion for Summary Judgment as to Counts I, II, and III of the Complaint. The Court grants summary judgment to Defendants on Plaintiff's claims for tortious interference with contract (Count III), damages for breach of contract (Count II), breach of the trade secrets and confidentiality provisions, and accounting (Count IV). The Court grants summary judgment to Plaintiff on its breach of the non-solicitation provision of the contract claim, except for the issue of damages (Count II); and on its claim for a permanent injunction preventing a breach of the Agreement (Count I). The only remaining issues in the case are the damages to be assessed for the breach of the non-solicitation provision and Defendants' breach of contract counterclaim (Count I).[6]

| August 5, 2010 | /s/ |
|---|---|
| Date | Alexander Williams, Jr. |
| | United States District Judge |

---

[6] Neither party moved for summary judgment on Defendant's counterclaim for breach of contract (Count I). In that claim, Defendant PCS alleges that Hearn failed to compensate it as agreed and that it owes PCS two thousand five hundred twenty-three dollars ($2,523).